**Linda KENNEDA, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 1:87–0912.

United States District Court,
S.D. West Virginia,
Bluefield Division.

March 11, 1993.

David W. Johnson, Lewis, Friedberg, Glasser, Casey & Rollins Charleston, WV, for plaintiff.

Stephen M. Horn and Carol A. Casto, Asst. U.S. Attys., Charleston, WV, for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

FABER, District Judge.

On August 11, 1987, plaintiff Linda Kenneda filed this action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671, *et seq.*, and the National Swine Flu Immunization Program of 1976, 42 U.S.C. § 248b, alleging that she had developed Guillain–Barre Syndrome as a result of a swine flu vaccine administered to her in Princeton, West Virginia, on November 19, 1976. The United States asserts that plaintiff's illness is not Guillain–Barre Syndrome and that it is unrelated to the swine flu vaccine.

This action was originally transferred by the Judicial Panel on Multidistrict Litigation to the United States District Court for the District of Columbia for coordinated pretrial proceedings, *In re Swine Flu Immunization Products Liability Litigation*, 89 F.R.D. 695 (D.D.C.1980), pursuant to 28 U.S.C. § 1407. The district court subsequently dismissed the complaint on the ground that the plaintiff had not filed her administrative claim within two years from the time her cause of action accrued as required by 28 U.S.C. § 2401(b). The dismissal was appealed, the judgment of

the district court was reversed and the case was remanded for further proceedings. *In re Swine Flu Immunization Products Liability Litigation, Kenneda v. United States,* 880 F.2d 1439 (D.C.Cir.1989). A conditional remand order was entered on February 13, 1990, and the case was officially reinstated on the active docket of this court on April 4, 1990.

A joint motion for separate trials on liability and damages was granted by Order dated April 7, 1992. A non-jury trial was held on liability on May 12–13, 1992. Although causation was vigorously contested, the United States stipulated that the plaintiff need not prove a theory of liability. Therefore, the only issue presently before this court is causation.

### Findings of Fact

1. The Swine Flu Program was enacted into law by Congress and the President in 1976 on an emergency basis in an effort to avoid a potential flu epidemic. The parties stipulated that the plaintiff Linda Kenneda received a swine flu vaccination at the Mercer County Health Care Clinic, Princeton, West Virginia, on November 19, 1976, and the court so finds.

2. Guillain–Barre Syndrome is a set of symptoms occurring together that primarily affect the peripheral nervous system. The peripheral nervous system is the portion of the nervous system which consists of nerves outside the brain and spinal cord, as opposed to the central nervous system, which consists of the brain and spinal cord. Guillain–Barre Syndrome has been described in a set of diagnostic criteria prepared by the National Institute of Neurological and Communicative Disorders and Stroke (hereinafter NINCDS).

3. Two principal symptoms characterize Guillain–Barre Syndrome, and the NINCDS criteria have identified each of these symptoms as required for diagnosis. The first is progressive motor weakness of more than one limb. This weakness can range from minimal weakness to total paralysis. The weakness most commonly begins in the lower extremities and ascends to the upper limbs. Usually the weakness is symmetrical. The second symptom required for diagnosis is a loss of reflexes, referred to as areflexia. The loss of reflexes need not be complete but some loss of reflexes is essential for diagnosis.

4. A prominent feature of Guillain–Barre Syndrome is a rapidly progressive paralysis which occurs over a relatively short period of time, usually peaking between the third and fourth week, followed by a stabilized period which is, in turn, followed by a period of recovery. The progression of the weakness is usually completed within three weeks. Ninety percent of the Guillain–Barre Syndrome patients will have stopped progressing after four weeks. Most patients recover completely. Some, however, may continue to have residual neurological deficits.

5. The exact cause of Guillain–Barre Syndrome is unknown. It is thought to be an inflammatory reaction to a foreign antigen. The introduction of the foreign antigen is thought to stimulate an autoimmune reaction which causes the body to attack itself. This reaction eventually causes the destruction of insulation around the nerves causing them to become dysfunctional. This process is known as demyelination.

6. Guillain–Barre Syndrome has been associated with a number of antecedent events. Those events include, but are not limited to, anesthesia, surgery, malignancy, vaccination, and viral infection. The most common antecedent event is a viral infection. In fact, fifty to sixty percent of all patients diagnosed with Guillain–Barre Syndrome describe an antecedent nonspecific viral illness, such as an upper respiratory infection or gastrointestinal illness.

7. Guillain–Barre Syndrome has also been associated with the administration of the swine flu vaccine. The evidence of a causal relationship between Guillain–Barre Syndrome and swine flu vaccine is epidemiological, or statistical. A study conducted by Dr. Lawrence Schonberger and reported in, *Guillain Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States, 1976–1977,* 110 Am.J. of Epidemiol. 105 (1979), analyzed and compared the Guillain–Barre Syndrome attack rates in both the vaccinated and unvac-

cinated populations of the United States. Schonberger utilized the NINCDS criteria for the identification of cases of Guillain–Barre Syndrome. The study found that the incidence of Guillain–Barre Syndrome increased significantly above the expected or normal rate after administration of the swine flu vaccination in 1976 and 1977. The study established that the largest percentage of vaccine-related Guillain–Barre Syndrome cases occurred in the second to third weeks following vaccination. The study further found no causal relationship between Guillain–Barre Syndrome and swine flu vaccination beyond ten weeks from the date of vaccination.

8. The plaintiff Linda Kenneda was born on February 2, 1947. The plaintiff is a woman of limited education and intellect, having completed the third grade of elementary school and having a full-scale I.Q. score on testing of approximately 72.

9. The plaintiff received a swine flu inoculation from the Mercer County Health Care Center in Princeton, West Virginia, on November 19, 1976. On that date, the Mercer County Health Care Center was acting as a "program participant" for the National Swine Flu Immunization Program.

10. At trial, plaintiff testified that on the evening she received the swine flu shot she became ill and vomited. By the third day following the shot, plaintiff testified that she felt better, but, by December 1976, she began to feel weakness, numbness and pain in her hands and feet. She further testified that while decorating her Christmas tree in December 1976, her legs became so weak that she fell into the Christmas tree.

11. The plaintiff testified that the symptoms she experienced near Christmas 1976 continued until January of 1977. She testified that she experienced similar symptoms during periodic episodes beginning in or around December 1977, May 1978, October and November 1978, April 1979, and April 1980. Mrs. Kenneda testified that in December of 1980, she experienced symptoms similar but more severe than those she experienced in December 1976. In 1980, she was sent by the Princeton Community Hospital to be examined by Dr. J. Gordon Burch in Roanoke, Virginia.

12. Mrs. Kenneda testified that in December 1980, Dr. Burch diagnosed her illness as Guillain–Barre Syndrome. According to Mrs. Kenneda's testimony, she first learned that there may be a connection between her illness and the swine flu vaccination in January 1985 when she was treated by Dr. Warren Olanow. She testified that she mistakenly told Dr. Olanow in 1985 that she had received the swine flu shot a few weeks before the symptoms began in 1979.

13. Although the court does not feel that Mrs. Kenneda was in any way deliberately dishonest, the court finds her testimony unreliable in light of the impeachment of her testimony by the United States.

14. On cross-examination Mrs. Kenneda admitted "I just get my dates confused" and "my memory isn't good." Mrs. Kenneda was also unable to remember times in which she received medical treatment for other conditions nor could she remember the dates of birth of her children.

15. The testimony offered by Mrs. Kenneda is further rendered unreliable by the fact that it does not appear consistent with the medical records relating to the period from November 1976 to December 1980. Significantly, Mrs. Kenneda was examined by Dr. Duremdes on February 4, 1977, and the record of such visit does not reflect that she complained of any weakness, numbness or tingling in her feet or legs.

16. In fact, the first incident in which the medical records reflect that Mrs. Kenneda mentioned any symptoms which are in any way consistent with Guillain–Barre Syndrome was on March 1, 1977, at which time she complained of some numbness in her hands. The attending physician apparently diagnosed Mrs. Kenneda's condition in March 1977 as tension headaches. Significantly, the doctor also noted that Mrs. Kenneda's deep tendon reflexes were present and symmetrical on March 1, 1977. The court, therefore, finds that, based on the inconsistencies between Mrs. Kenneda's testimony and the medical records dating from the time of the vaccination through 1980, and

Mrs. Kenneda's admitted inability to remember the timing of specific incidences, Mrs. Kenneda's testimony regarding the onset of her illness is unreliable.

17. The court also finds that the testimony presented on Mrs. Kenneda's behalf by her sister, her son and her daughter is unreliable and insufficient to establish the date of the onset of plaintiff's illness.

18. Plaintiff's daughter, Melanie Ann Baisden, testified that she had spent the summer with her mother in 1976 and that she "seemed fine" at that time. Ms. Baisden further testified, however, that in August of 1977 she stayed with her mother for a period during the summer and that her mother complained of tingling and numbness in her feet and hands. Ms. Baisden testified that in the summers of 1978 and 1979, her mother experienced similar symptoms of numbness and that in 1979 her mother was weak and had to lean on furniture in order to walk.

19. More specifically, Ms. Baisden testified that on August 16, 1977, her mother began crying, complained of numbness and coldness in her feet, was unable to walk without dragging her feet, and exclaimed that her hands were numb. Despite Ms. Baisden's testimony regarding the weakness and numbness experienced by her mother on August 16, 1977, the record reflects that the plaintiff did not mention such symptoms when she visited the Mercer County Health Care Clinic the next day, on August 17, 1977, and requested a strep test. The plaintiff also visited Dr. Dean Patton on August 18, 1977, complaining of a sore throat and burning in her shoulder and neck, and plaintiff returned to the Mercer County Health Care Clinic on August 22, 1977, again complaining of burning in her neck. None of the medical records relating to these three doctor visits within a week of the incident testified to by Ms. Baisden reflect that the plaintiff informed the doctors of any weakness, numbness, tingling or sensory change or difficulty in walking. This inconsistency between Ms. Baisden's testimony and the medical record, as well as the fact that Ms. Baisden did not reside with her mother but merely visited during school breaks, renders Ms. Baisden's testimony unreliable.

20. Mrs. Kenneda's son, Virgil J. Kenneda, also testified regarding his mother's condition following the swine flu vaccination. Virgil Kenneda testified that his mother became ill the night she received the swine flu vaccination and confirmed the incident in which his mother fell into the Christmas tree. Virgil Kenneda further testified that his mother was still having problems relating to recurrent numbness and tingling on her birthday in February 1977. He testified that after December of 1976, he and his father had to begin helping with the house work because his mother was having difficulty completing such work due to her illness.

21. Virgil Kenneda further testified that his date of birth was May 21, 1970. Accordingly, Mr. Kenneda was only six years old at the time his mother received the swine flu shot. The court finds, due to Mr. Kenneda's young age at the time his mother received the swine flu vaccination and the period immediately following her receipt of such inoculation, that his testimony is unreliable. This finding is further supported by Mr. Kenneda's own testimony that he was too young to remember whether or not his mother went to the doctor on February 4, 1977.

22. The plaintiff's sister, Emmial Grace Porter, also testified as to plaintiff's condition in December 1976. Ms. Porter testified that the plaintiff had given her her old Christmas tree near Christmas 1976, and that she had mistakenly left her Santa Claus in the box with the Christmas tree. Ms. Porter testified that she called the plaintiff to inform her that her decoration was mistakenly included with the Christmas tree and that the plaintiff told her at that time that she had fallen into her own Christmas tree while decorating it. Ms. Porter further testified that she had visited the plaintiff in the Spring of 1977 and that the plaintiff complained that her feet were cold and asked her to sit on them to warm them.

23. The court finds the testimony of Ms. Porter to be unreliable in that it is inconsistent with the testimony offered by the plaintiff. In her direct testimony at trial, the plaintiff testified that she did not have a telephone in 1976 and had only obtained one

in 1977. Accordingly, Ms. Porter's testimony that she had called the plaintiff in December 1976 is unreliable. Such discrepancy, when combined with the inconsistency between Ms. Porter's testimony and the medical records introduced at trial, sheds considerable doubt upon the reliability of Ms. Porter's testimony.

24. In addition to the live testimony offered at trial, the plaintiff submitted the depositions of a number of expert witnesses, including Dr. Lawrence B. Schonberger, Dr. Charles M. Poser, and Dr. Joseph A. Bellanti. Each of these depositions was taken in connection with the multi-district litigation and the record does not indicate that any of these physicians actually treated or examined Mrs. Kenneda in relation to her illness.

25. The deposition of Dr. Bellanti was offered by the plaintiff to establish the theory that a patient may have an initial occurrence of Guillain–Barre Syndrome which causes the patient to be sensitive to further relapses or incidences of the disease. Such theory is commonly referred to as a "sensitization" theory. Based on his deposition testimony, the court finds that the theory set forth by Dr. Bellanti enjoys at least minimal support in the medical community as a valid theory applicable to some Guillain–Barre Syndrome patients.

The court, however, finds it unnecessary to determine whether or not Dr. Bellanti's "sensitization" theory enjoys sufficient acceptance within the medical community to render it admissible in this case because, even if such a theory is accepted as valid by the court, the medical evidence relating to the plaintiff in this case does not support a finding that Dr. Bellanti's theory was applicable to the plaintiff's medical condition. The medical records introduced in this case, when coupled with the testimony of Drs. Burch and Olanow, are insufficient to establish an attack of Guillain–Barre Syndrome of even mild severity prior to 1980. Accordingly, there is no evidence that the swine flu vaccination caused an initial reaction which rendered plaintiff "sensitive" to subsequent, more severe attacks.

26. The court finds that the *Diagnostic Criterions for Guillain–Barre Meningitis Caused by Haemophilus influenzae,* 240 J.A.M.A. 1709 (October 13, 1970), which set forth the two features required for diagnosis of Guillain–Barre Syndrome as (1) progressive motor weakness of more than one limb, and (2) areflexia or loss of tendon jerks, is the standard by which the facts of this case must be evaluated. (Exhibit 4, Deposition of Charles Poser, M.D., May 11, 1979). The court further finds that the criteria established by the National Institute of Neurological and Communicative Disorders and Stroke (NINCDS), introduced as Exhibit 4 to the Posner deposition, is the criteria generally followed by neurologists in diagnosing Guillain–Barre Syndrome. (Deposition of Charles Posner, M.D., May 11, 1979, at 65–66).

27. Although the United States maintains that the illness suffered by the plaintiff is not, in fact, Guillain–Barre Syndrome, but merely a variant of Guillain–Barre, the record reflects that the plaintiff, at the time of her diagnosis in 1980, did in fact suffer from Guillain–Barre Syndrome. The deposition testimony of both the United States' expert witness, J. Gordon Burch, M.D., and that of the plaintiff's expert witness, Warren Olanow, M.D., both state that the plaintiff suffers or has suffered from Guillain–Barre Syndrome. (Deposition of John Gordon Burch, M.D., April 21, 1992, at 54; Deposition of Dr. Warren Olanow, February 25, 1992, at 110–111 (By Counsel for Defendant)). In addition, the antecedent causes or events related to an acute Guillain–Barre Syndrome and a chronic relapsing form of Inflammatory Polyneuropathy are believed to be similar if not identical. (Deposition of Warren Olanow, M.D., February 25, 1992, at 27 (By Counsel for Plaintiff)). Accordingly, the court finds that the plaintiff, at least since her diagnosis by Dr. Burch in December 1980, has in fact suffered from Guillain–Barre Syndrome.

28. Both the testimony of plaintiff's expert witness, Dr. Warren Olanow, and the testimony of the United States' expert witness, Dr. John Gordon Burch, discuss the initial onset of the plaintiff's Guillain–Barre Syndrome and both doctors have reviewed the medical records relating to the plaintiff from the date of the vaccination on Novem-

ber 19, 1976, through her diagnosis of Guillain–Barre Syndrome in December 1980.

29. Based on the expert testimony at trial and the criteria set forth in Exhibit 4 to the deposition of Charles M. Poser, M.D., taken on May 11, 1979, the court finds that in order to establish a causal connection between the swine flu inoculation received by the plaintiff on November 19, 1976, and the Guillain–Barre Syndrome suffered by the plaintiff, the plaintiff must establish, by a preponderance of the evidence, that the plaintiff suffered both motor weakness of more than one limb and some areflexia within ten weeks of her receipt of the swine flue inoculation. (Schonberger, *Guillain–Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States, 1976–1977*, 110 Am.J. Epidemiol. 105, 112 (1979), Plaintiff's Exhibit 5; *Diagnostic Criterions for Guillain–Barre Meningitis Caused by Haemophilus Influenzae*, 240 J.A.M.A. 1709 (October 13, 1978), Exhibit 4, Deposition of Charles M. Poser, M.D., May 11, 1979).

30. Although the plaintiff visited numerous doctors regarding a large array of illnesses during the period between the swine flu vaccination and her diagnosis of Guillain–Barre Syndrome in December 1980, the medical records do not reflect that she reported any incident of weakness prior to 1979 or 1980. (Joint Exhibit No. 3; Deposition of Warren Olanow, M.D., February 25, 1992, at 58 (By Counsel for Defendant)).

31. With regard to impairment of deep tendon reflexes, medical records relating to plaintiff's visit to Mercer County Health Care Center on March 1, 1977, reflect that "DTR" or deep tendon reflexes were symmetrical. (Joint Exhibit No. 3 at 241). Records relating to the plaintiff's September 26, 1978 examination by Dr. E. Lyle Gage, Jr., M.D., also indicate "reflexes are equal and active throughout and there are no pathological reflexes." (Joint Exhibit 3 at 144). Further, medical records regarding the plaintiff's January 23, 1979 examination by Dr. Roy R. Raub, M.D., state: "[h]er knee jerks and ankle jerks are present and bilaterally equal." (Joint Exhibit No. 3 at 482). Again on June 14, 1979, her "DTR's" or deep tendon reflexes were "still 2+," which is apparently normal. (Joint Exhibit No. 3 at 358). On December 26, 1979, Dr. Richard E. Davenport, M.D., reported that the plaintiff's reflexes "were noted to be good." (Joint Exhibit No. 3 at 680). Finally, on February 14, 1980, Dr. Dean Patton noted plaintiff "has full range of motion of her leg. DTR's are 2+." (Joint Exhibit No. 3 at 361).

32. Within the medical records introduced at trial, the first indication of diminished reflexes is noted in April 1980, by Dr. E. Lyle Gage, Jr., M.D. Under the paragraph entitled physical examination, Dr. Gage noted in his consultation note "reflexes are 1+ and symmetrical in the uppers. Knee jerks are absent-absent, ankle jerks are absent-absent. There are no pathological reflexes noted." (Joint Exhibit No. 3 at 724). Plaintiff's diminished tendon reflexes were confirmed by John Williams, a physical therapist, in his physical therapy assessment recorded in April 1980. (Joint Exhibit No. 3 at 733).

33. Dr. John Gordon Burch, M.D., testified, by deposition, that the presence of reflexes during the January 23, 1979 examination of the plaintiff by Dr. Raub, indicated that the plaintiff was not suffering from Guillain–Barre Syndrome at that time. Specifically, Dr. Burch testified:

Well, it is a very important negative that would rule against the diagnosis. Guillain–Barre is an entity in which the reflexes are typically lost and lost early in the course of disease. In fact, the reflexes may be lost or diminished at a time when there is very little else to find on the examination.

This finding of equal reflexes and elicitable reflexes would certainly make it most unlikely that symptoms presenting at that time were related to a polyneuropathy.

(Deposition of John Gordon Burch, M.D., April 21, 1992, at 15). Dr. Burch, further stated: "Very typically, the deep tendon reflexes are diminished and often absent altogether, and as I stated earlier in my testimony, this change in reflex status is frequently an early change and may be the very first change before other abnormalities can be detected on examination...." (Deposition of

John Gordon Burch, M.D., April 21, 1992, at 23). Finally, Dr. Burch stated:

I would be unprepared to accept an episode of neurological dysfunction as consistent with Guillain–Barre if the reflexes remain intact unless every alternative explanation for the dysfunction have been investigated and ruled out and the course was unequivocally that of Guillain–Barre.

. . . . .

I am saying that at the time of symptoms presenting to a physician where his obligation is to make a judgment as to whether this is Guillain–Barre or no, the presence or absence of reflexes at that time is an important and I will say even critical ingredient of the analysis.

. . . . .

If a young physician presented a case to me wherein there were symptoms suggesting Guillain–Barre but in the course of his exam he indicated that the reflexes remained intact, my response to him would be you had better move Guillain–Barre down the list of possibilities because we have got to look for alternative diagnoses; so it is not an absolute, but it would really dissuade me from that diagnosis.

(Deposition of John Gordon Burch, M.D., April 21, 1992, at 80–84).

34. The plaintiff's expert witness, Dr. Warren Olanow, also recognized that in a peripheral neuropathy, whether acute Guillain–Barre or chronic relapsing Guillain–Barre, deep tendon reflexes tend to be lost, and such reflexes were apparently present in plaintiff in 1979. (Deposition of Warren Olanow, M.D., February 25, 1992, at 109 (By Counsel for Defendant)).

35. Dr. Olanow further discussed the significance of the presence or absence of reflexes during the following colloquy:

Q: Now, in taking his finding and the finding of the previous physician in 1979 who found that she did have deep tendon reflexes, what does that tell you or what can you tell us about the disease that she had and its process?

A: Well, I can start by telling you that I have confidence in Dr. Burch's evaluation and I'm confident that her reflexes were absent when he says they were absent. I don't know that I can say the same about the evaluations in 1979. It is possible that the reflexes were absent and that poor technique or form allowed for what are called myogenic rather than deep tendon reflexes to be misinterpreted as positive.

But if it were known that her deep tendon reflexes were present in 1979 and absent in 1980, that would tell you that something had happened to peripheral nerve function between those two dates that had influenced them in such a way that they had now manifested this level of disability.

I can tell you that in people who have peripheral neuropathies of whatever type, there is a tendency for the deep tendon reflexes to be lost relative early and very often they will not recover.

Q: Okay. And let me phrase it as best as I can as a layman and you tell me if my thinking is correct. If that finding in 1979 of positive deep tendon reflexes is correct, am I understanding you to say that that would be indicative of her not having chronic inflammatory polyneuropathy?

A: Well, it would be indicative of the fact that she had not had a significant enough neuropathy to have dropped her deep tendon reflexes, which means that it wasn't very significant at all, assuming that it was present.

Q: Okay. And if we back up to what Carol previously asked you, assuming that is true, does it cause you any concern in this case from the date that she got the swine flu inoculation in 1976, coming forward with deep tendon reflexes in 1979 and not in 1980?

A: I would say it does cause me some concern. I would say it is probably the strongest argument that there wasn't a relationship in that one could argue that the presence of deep tendon reflexes in 1979 would argue that either there was no involvement of peripheral nerves at that early date or at that late date, or that the involvement was so minor that it had not even affected the deep tendon reflexes.

(Deposition of Warren Olanow, M.D., February 25, 1992, at 115–117 (by counsel for defendant)).

36. Based on the express text of the medical records contained in Joint Exhibit No. 3, and the testimony of Dr. Burch and Dr. Olanow, the court finds that the plaintiff's deep tendon reflexes were present at least up to and including the day on which she was examined by Dr. Patton on February 14, 1980.

37. While the medical records contained in Joint Exhibit No. 3 contain entries detailing symptoms which are *consistent* with the wide range of symptoms which may be present with Guillain–Barre Syndrome, such symptoms are consistent with a myriad of other illnesses and are not of the type required for *diagnosis* of Guillain–Barre Syndrome. The testimony of both Dr. Burch and Dr. Olanow establishes that the first incident from which Guillain–Barre Syndrome could be diagnosed took place in 1980. In the deposition of Dr. Olanow, the following colloquy takes place:

Q: Let me ask you this then. Based upon what we have shown you or upon the records that you have reviewed here, do you have an opinion about what is the first identifiable episode of Guillain–Barre?

Mr. Johnson: Are you asking him for consistent or for diagnostic?

Ms. Casto: I want to know if he has an opinion about what he feels comfortable saying was Guillain–Barre. I don't know how that—

A: I feel very uncomfortable commenting on any of this until it gets to Dr. Burch's office which I think is in sometime in 1980, if memory serves me.

(Deposition of Warren Olanow, M.D., February 25, 1992, at 107–108 (By Counsel for Defendant)). In the deposition of Dr. Burch, the following question is posed:

Q: Is there anything in that medical record upon which you can rely to establish, to establish, an episode of Guillain–Barre prior to April of 1980?

A: No evidence points to an episode before April of 1980.

(Deposition of John Gordon Burch, M.D., April 21, 1992, at 115).

Q: Do you have an opinion today now having had the opportunity to review all of the available medical records in this case concerning those episodes prior to January of 1979?

A: It is my medical opinion that the episodes in question that predate 1979, actually 1980, were of such a character as to have an alternative explanation or to be of sufficient vagueness as to disallow definitive diagnosis.

Q: And then, Doctor, can you testify today within a reasonable degree of medical probability that each of the events prior to 1979 were not episodes of Guillain–Barre?

A: It is my judgment that there is no evidence for any episode of Guillain–Barré predating March/April of 1980.

(Deposition of John Gordon Burch, M.D., April 21, 1992, at 12).

Q: And your testimony is that the records that you have been reviewing here today prior to 1980 are in such a state that it is basically impossible for you to render a definitive conclusion, right?

A: There is insufficient evidence from any previous record to implicate an episode of Guillain–Barré prior to April of '80.

Q: Or to rule it out, correct?

A: Well, you have to look at the diagnosis of Guillain–Barre as one that is supported by data. I mean, I could take any patient at any point in time and say, well, you don't have sufficient evidence to rule out a malignancy. And the answer is, no, I don't, because that can always be lurking.

But the issue here is that there simply is no record, no data base adequately obtained and documented to indicate any attack of Guillain–Barre prior to the April '80 incident.

(Deposition of John Gordon Burch, M.D., April 21, 1992, at 103–104.)

38. Although Dr. Olanow, by deposition, expressed his opinion to a reasonable degree of medical probability that the swine flu vaccination received by the plaintiff and the plaintiff's Guillain–Barre Syndrome are causally related, the equivocal nature of Dr. Ola-

now's opinion renders it, in the court's opinion, unreliable and unconvincing. In clarifying his opinion, Dr. Olanow stated:

Well, I think that I can tell you categorically that I cannot tell you with certainty what the antecedent cause of this woman's chronic relapsing inflammatory polyneuropathy is.

I think I could also tell you that I am unable to state with even a high level of confidence what the antecedent cause is. But unfortunately for we physicians, you lawyers ask us to render opinions based on medical certainty which you define as an iota greater than 50 percent. And that becomes a judgment call. And we are used to making judgments, I'm not opposed to making a judgment, but I think it is very important to understand that lawyers are ultimately used to having right and wrong answers. The jury says you are right or you are wrong or the judge says you are right or you are wrong. With doctors, it doesn't matter what I say and what my medical certainty is; there is a right answer. And there is an absolute truth that maybe we will never discover in our lifetime but somewhere exists absolute truth. And that's why doctors are really reluctant to go out on the kinds of limbs you lawyers often ask us to do.

But having said that, I believe that swine flu is such a well known antecedent of an inflammatory neuropathy that to see someone develop a chronic inflammatory peripheral neuropathy for which an antecedent date cannot be unquestionably defined and to know that within a time frame that is not wholly out of the question there was exposure to such a vaccination, causes me to say with considerable regret and with clear unwillingness to state that it is categorical, that the two are more likely to be related than not, which qualifies in your lingo for "to the best of my medical judgment" or—.

Mr. Johnson: Reasonable degree of medical probability.

(Deposition of Warren Olanow, M.D., February 25, 1992, at 96–97 (By Counsel for Defendant)).

39. The evidence adduced at trial establishes that there are a number of antecedent events which may be causally related to Guillain–Barre Syndrome. Such antecedent events include surgery, trauma, EB virus, certain kinds of leukemia and lymphoma and viral infections. Of the known causes for Guillain–Barre Syndrome, viral infections are the most common antecedent events (Deposition of Dr. Warren Olanow, February 25, 1992, at 26 (By Counsel for Defendant); Deposition of John Gordon Burch, M.D., April 21, 1992, at 44).

40. Approximately half of patients suffering from Guillain–Barre Syndrome:

give a history of an antecedent acute infectious illness that has usually cleared by the time the neuropathic symptoms begin (citations omitted). Most commonly the antecedent illness is described as influenza-like with fever; sometimes patients mention an acute dysenteric episode. Less commonly an earlier episode of low back pain is recalled.

The interval between the prodromal infectious episode and the onset of neuropathic symptoms is variable; most frequently it is one to three weeks....

(Arnason, *Inflammatory Polyradiculoneoropathies*, Chapter 56, 1110, Joint Exhibit 4).

41. On March 12, 1980, plaintiff was treated by Dr. Dean Patton for pain in her ears and coughing. Dr. Patton diagnosed the problem as a "URI" or upper respiratory infection. (Joint Exhibit No. 3 at 362). On March 19, 1980, plaintiff returned to Dr. Patton complaining of drawing on the right side of her face, pain and burning on her face and dizziness. (Joint Exhibit No. 3 at 362). On April 8, 1980, plaintiff was examined by Dr. Roy R. Raub, M.D. At this examination, plaintiff complained of pain in her lower back and stated that her legs gave out, that there was numbness in her legs and fingers, swelling in her fingers, and that she was experiencing cramping and stiffness. (Joint Exhibit No. 3 at 484). The following day, April 9, 1980, plaintiff was admitted to Princeton Community Hospital under the care of Dr. K. Rana, M.D. It was during her stay at Princeton Community Hospital in April 1980 that, for the first time reflected in the medi-

cal records, plaintiff's reflexes were found to be diminished. (Joint Exhibit No. 3 at 724). This April 1980 episode is identified by Dr. Burch as the first recorded incident in which plaintiff suffered an attack of Guillain–Barre Syndrome. (Deposition of John Gordon Burch, M.D., April 21, 1992 at 61).

42. Because of the proximity in time between the diagnosis of an upper respiratory infection on March 12, 1980, the weakness and soreness of plaintiff's legs and hands on April 8 and 9, 1980, and the diminished reflexes discovered during the examination on April 9, 1980, the court finds that it is likely that the Guillain–Barre Syndrome suffered by the plaintiff was caused by the upper respiratory infection she suffered in March 1980. The belief that the upper respiratory infection suffered by the plaintiff may have been the antecedent cause of her Guillain–Barre Syndrome was also expressly adopted by Burch in his deposition. (Deposition of John Gordon Burch, M.D., April 21, 1992, at 61–62).

### Conclusions of Law

1. The United States has objected to the expert opinion as to causation offered by Warren Olanow, M.D. Decisions as to the admissibility of expert opinion testimony rest within the broad discretion of the trial court. *South Cent. Petroleum, Inc. v. Long Bros. Oil Co.*, 974 F.2d 1015, 1019 (8th Cir.1992). "Any weakness in the factual underpinnings of [the expert's] opinion go to the weight and credibility of his testimony, not to its admissibility." *Id.* Accordingly, the court concludes that the testimony of Dr. Warren Olanow as to causation is admissible. Dr. Olanow is clearly qualified, not only by his education, but also as a result of his experience in diagnosing and treating Guillain–Barre Syndrome and polyneuropathies, to give an opinion as to causation in this case, pursuant to Rule 702 of the Federal Rules of Evidence. In addition, the fact that this trial was a trial without a jury reduces the potential for prejudice from such an opinion, in that the court is presumed to have the ability to discern whether or not evidence is admissible for a particular purpose and to give such evidence the proper weight to which it

is entitled. *Chicago Title Ins.*, 985 F.2d 553 (4th Cir., February 8, 1993) (unpublished opinion). *See, Carter v. Hewitt,* 617 F.2d 961, 972 n. 13 (3d Cir.1980).

2. The parties have raised numerous objections within the text of the depositions introduced as evidence in this case. The objections found within the depositions relate primarily to questions of speculation by witnesses, relevance of testimony, and the ability of a particular witness to answer the question posed.

Because this case was tried before the court as a bench trial, the court's findings are presumed to be based on admissible evidence. *Fishing Fleet, Inc. v. Trident Ins. Co., Ltd.,* 598 F.2d 925 (5th Cir.1979); *see also, Chicago Title Ins. Co. v. IMG Exeter Associates Limited Partnership,* 985 F.2d 553 (4th Cir.1993) (unpublished opinion). Accordingly, the court finds it unnecessary to rule on each separate objection raised by the parties within their depositions. The court has considered those objections relating to the evidence supporting the findings contained herein and, to the extent such objections relate to the evidence which the court cites in support of its findings, such objections are hereby overruled.

3. Having reviewed the evidence submitted by the parties during the trial held on May 12–13, 1992, and the deposition testimony, professional works, and medical records submitted by the parties for the court's review, the court hereby concludes that the plaintiff has failed to establish, by a preponderance of the evidence, a causal relationship between the swine flu vaccination plaintiff received on November 19, 1976, and the Guillain–Barre Syndrome of which she was diagnosed in December 1980.

4. The court, therefore, finds that the defendant, the United States of America, is not liable to the plaintiff Linda Kenneda for damages she has suffered as a result of her illness.

A separate Judgment Order of even date herewith will be entered consistent with this

opinion and the findings and conclusions contained herein.